1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSELITO RICAFORT,                                  No. C 05-3612 MHP (pr)

            Petitioner,                    **ORDER DENYING PETITION FOR**
                                           **WRIT OF HABEAS CORPUS**

    v.

THOMAS CAREY, warden,

            Respondent.
                                          /

**INTRODUCTION**

    Joselito Ricafort filed this pro se action seeking a writ of habeas corpus under 28

U.S.C. § 2254.  This matter is now before the court for consideration of the merits of the

habeas petition.  For the reasons discussed below, the petition will be denied.

**BACKGROUND**

A.    The Crimes

    David Stokley lived at 1125 Carolina Street, San Francisco, California.  He met

Joselito Ricafort on a telephone chat line in April 2001; they began a romantic relationship

and Stokley invited Ricafort to move in with him in about May or June 2001.

    Stokley did not live alone, however.  Also residing in his home was Grace Patigdas.

Patigdas was the widow of Stokley's former long-term domestic partner, Alex.  Stokley had

pledged to Alex that he would take care of Patigdas after Alex died.  He did, and Patigdas

lived with Stokley as his housekeeper and friend after Alex died.  Stokley also assured

Patigdas' financial well-being.

**United States District Court**
For the Northern District of California

1    When Ricafort first moved in to the household, he and Patigdas seemed to get along

2 well, but their relationship began to deteriorate in July 2001.  Ricafort told Stokley that

3 Patigdas should move out and that she did not respect Ricafort.  The relationship between

4 Ricafort and Patigdas worsened and he repeated demands that Stokley move her out of the

5 residence.  Then Ricafort told Stokley that Stokley should not help Patigdas with her rent or

6 continue to help Alex's other relatives in the Philippines.  Stokley told Ricafort that he would

7 think about finding a place for Patigdas, but decided against it because Ricafort's demands

8 were growing increasingly unreasonable.  Ricafort grew more irrational, feigned suicide

9 attempts and kept a carving knife near his bed.

10    Sometime towards the end of August, Patigdas was getting ready for work.
11 She made noise shutting cabinet doors in the kitchen and then turned the fan on in the
bathroom. [Ricafort] became agitated because of the noise and went to the bathroom
12 door.  When Patigdas tried to close the door, [Ricafort] said, "I don't want to hurt you.
I just want to talk to you." Patigdas told him that she would call the police if he hurt
13 her.  She closed the door and [Ricafort] kicked it two or three times.  Stokley pulled
him away from the door.  Patigdas heard [Ricafort] tell Stokley to kick her out of the
14 house.  [Ricafort] later told Stokley that Patigdas had to leave or he was going to kill
her.  [Ricafort] repeated this statement on two to four occasions after he kicked the
15 door.  Stokley did not call the police because he was concerned that [Ricafort] was
having problems with his immigration status. [¶]  A few days later, Stokley told
16 Patigdas that [Ricafort] said he would kill her if she did not move.  Concerned for her
safety, Stokley moved her upstairs to stay with Nick Van Riesen and Nick Gayola,
17 who co-owned the building with Stokley.

18 Thereafter, Ricafort feigned suicide attempts.  Stokley consulted with someone from a

19 suicide prevention group and afterward determined Ricafort's suicide threat was not credible.

20 Stokley had the locks on the house changed and had Patigdas move back downstairs to the

21 residence on August 29.

22    [Ricafort] returned later that night, pleading to be let in the house.  Stokley refused to
let him in and told him to get a motel room.  The police came, and eventually
23 [Ricafort] went to a motel.  Within the next few days, Stokley went to [Ricafort's]
motel room and found him lying on the bed, with a glass of bleach on the table.  He
24 told Stokley he drank the bleach, but he did not seem ill to Stokley.  Stokley gave him
a check for $8,000 to secure an apartment in Vallejo before [Ricafort's] mother arrived
25 for a visit.  When [Ricafort] was unable to obtain the apartment due to poor credit,
Stokley agreed to put his name on the lease with [Ricafort.]

26    [Ricafort's] mother, along with her caretaker, arrived on September 19 and
27 stayed in the Vallejo apartment with [Ricafort] until January or 2002.  Stokley
continued to visit [Ricafort] in Vallejo, and in September, he took [Ricafort] and his
28 mother to Las Vegas.  Throughout the time that [Ricafort] lived in the Vallejo
apartment, he continued to complain to Stokley about Patigdas, saying that she was

2

enjoying the nice things Stokley had and that if it weren't for Patigdas, [Ricafort] would be living with Stokley. He continued to demand that Stokley evict Patigdas and let [Ricafort] move back into the Carolina Street residence. [Ricafort] blamed Patigdas for the deterioration of his relationship with Stokley.

In January of 2002, Stokley told [Ricafort] he was not going to take him on a planned trip to Pennsylvania. [Ricafort] became angry and they had an argument. Stokley also told [Ricafort] he would not be able to see him on the 25th, because he was taking friends to the airport that morning.

On January 25, Stokley took Patigdas to work and returned to Carolina Street about 8:15 or 8:30 a.m. About 9 a.m., he left with [upstairs neighbors] Van Riesen and Gayola to take their friend to the airport. Within 30 minutes, a neighbor heard an explosion and saw flames coming out of the window of 1125 Carolina Street. Records showed that 911 calls about the fire began coming in at 9:27 a.m.

After dropping Gayola and the friend at the airport, Stokley and Van Riesen had breakfast and then returned to Carolina Street around 11:30 a.m. As they drove up, Stokley saw a burned mattress on the sidewalk adjacent to the house. A neighbor approached Stokley and Van Riesen and told them there had been a fire in the lower unit and gave Stokley a fire inspector's business card. Stokley and Van Riesen entered with the key through the gate and found the front door unlocked, but no sign of a forced entry. As they entered the unit, Stokley noted a strong smell of gasoline. Patigdas's room was burned and her furnishings and clothing were ruined. The fire had not damaged the other rooms.

In the living room, Stokley found a white gallon detergent bottle with "PAR" written on it and a plastic bag from Las Vegas. Stokley did not use that brand of detergent. He showed the items to the fire inspector. The bottle smelled of gasoline. The investigators noted a strong smell of gasoline as they entered the apartment. They saw a red gas can, three-quarters full of gas, and a knife lying in the hallway. The fire was a fast-moving fire, apparently started by gasoline poured on the bed. The explosion generated sufficient force to blow the security bars out of the bedroom window. The inspector concluded that the fire was intentionally set, caused by ignition of the gasoline on the bed.

Fire Inspector Pistoia opined that the fire was a "spite fire," set for reasons of jealousy or spite. He also stated that prior to setting such a fire, the perpetrator will often remove an item from the house that he or she feels is not replaceable. Stokley noted he had found some valuable coins at [Ricafort's] apartment in November before the fire. The coins had been taken from the Carolina Street residence.

Stokley's spare key to his apartment was missing from the garage. When fire inspectors asked if anyone had a grudge against the occupant of the burned room, Stokley named [Ricafort]. Stokley called [Ricafort] at the Vallejo apartment on the 25th of January to tell him there had been a fire and that he gave [Ricafort's] name to the authorities because they asked if anyone had a grudge against Patigdas.

Police asked Stokley to accompany them to the Vallejo apartment that he shared with [Ricafort]. Stokley gave his consent to a search of the apartment and opened the door for the police with his key. [Ricafort] was at home when the police entered. The police found a letter addressed to Stokley in [Ricafort's] briefcase dated December 2001, in which [Ricafort] discussed killing Patigdas and committing suicide. Police also found a note pad with 13 handwritten pages titled, "Lito's 122 Passion with David Stokley." It contained statements referring to Stokley evicting

3

[Ricafort] instead of Patigdas and that Patigdas was enjoying Stokley's house instead of [Ricafort].

Police found a red plastic gas can containing gasoline in [Ricafort's] car trunk. They also seized a Fastrak transponder from the car. Police inspectors Levin and Keller took [Ricafort] into custody. While Levin was driving [Ricafort] back to the jail, [Ricafort] admitted that his car's Fastrak transponder would show that he drove across the Bay Bridge the morning of January 25. California Department of Transportation (Caltrans) records showed that the transponder crossed the bridge to San Francisco at 6:35 a.m. on January 25. Caltrans records also showed that [Ricafort] called on February 1 and complained that he had not gone through the toll plaza on January 25. Caltrans waived the charge even though there was no support for [Ricafort's] claim. [Ricafort] complained before he received his billing statement for the January 25 toll.

At the police station, [Ricafort] waived his rights and agreed to talk to police. He told them he wanted to kill Patigdas in August, but stated that he would not kill her while his mother was visiting. [Ricafort] blamed Patigdas for all the problems in his life, and said he would stab her, rather than shoot her if he killed her. At the end of the interview, [Ricafort] denied burning the house. Levin asked [Ricafort] if he intended to kill Patigdas when he went to Carolina Street on January 25. [Ricafort] replied that he knew Patigdas would not be home.

Cal. Ct. App. Opinion, pp. 3-6 (footnotes omitted).

Ricafort offered an alibi defense at trial, i.e., that he was at the apartment in Vallejo at the time the fire was set in San Francisco. He presented testimony from his mother and a dancing acquaintance. His mother's testimony was undermined by her earlier contradictory statements to a fire inspector about the times on January 25 when she had seen her son.

B.   Procedural History

Ricafort was charged in San Francisco County Superior Court with arson of a residence, burglary of that residence, and making a criminal threat against Patigdas. See Cal. Penal Code § 451(b), 459, and 422. At his first trial, the jury acquitted him of making a criminal threat against Patigdas. The jury was unable to reach a verdict on the other two counts and the court declared a mistrial. At his second trial, the jury found Ricafort guilty of arson of an inhabited structure and first degree burglary. The court sentenced Ricafort to five years in prison on the arson count and stayed the sentence for the burglary count. The superior court later corrected Ricafort's presentence custody credits.

Ricafort had two appeals: one from the conviction and one from the sentence correction order. The California Court of Appeal affirmed the judgment of conviction and

the California Supreme Court denied his petition for review.   In a second appeal, the California Court of Appeal affirmed the order of the superior court correcting the presentence custody credits and the California Supreme Court denied the petition for review.  The California Supreme Court also denied two habeas petitions filed by Ricafort.

In his federal petition, Ricafort asserts the following claims: First, he claims his constitutional right to be present was violated when several court proceedings were held in his absence.  Second, he contends that he received ineffective assistance of counsel.  Third, he contends he was denied his right to present a defense when the trial court excluded evidence that he had been acquitted of the charge of making a criminal threat against Patigdas.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in San Francisco County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

      "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

## DISCUSSION

A.    Right To Be Present

      Petitioner contends that his constitutional right to be present at his trial was violated because he was not present during four proceedings: a pretrial conference on October 7, 2002; the screening of prospective jurors for hardships and language difficulties on October 8, 2002; a mid-trial hearing on proposed jury instructions, an amendment to the information and a renewed motion to dismiss on October 29, 2002; and a post-trial hearing at which the court corrected the presentence credits on November 11, 2003.  Ricafort had not been excluded by court order; rather, his absence was because his attorney waived his right to be present at the proceedings.

1    The Supreme Court has recognized that "the right to personal presence at all critical

2    stages of the trial . . . [is a] fundamental right[] of each criminal defendant."  Rushen v.

3    Spain, 464 U.S. 114, 117 (1983).  This right derives from the Confrontation Clause of the

4    Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments.

5    Campbell v. Wood, 18 F.3d 662, 671 (9th Cir.) (en banc), cert. denied, 511 U.S. 1119 (1994).

6    The Confrontation Clause protects a defendant's right to face his accusers and applies to

7    every stage of a trial.  See Illinois v. Allen, 397 U.S. 337, 338 (1970).   Due process protects

8    a defendant's right to be present "at any stage of the criminal proceeding that is critical to its

9    outcome if his presence would contribute to the fairness of the procedure." Kentucky v.

10   Stincer, 482 U.S. 730, 745 (1987).  A defendant's presence contributes to the fairness of a

11   procedure when, in light of the nature of the situation, defendant's presence would be useful

12   in ensuring a more reliable determination.  Id. at 747.  In Snyder v. Massachusetts, 291 U.S.

13   97, 105-06 (1934), the Court articulated the standard as a right to be present and participate if

14   his presence "has a relation, reasonably substantial, to the fullness of his opportunity to

15   defend against the charge."  See also id. at 107-08 ("So far as the Fourteenth Amendment is

16   concerned, the presence of a defendant is a condition of due process to the extent that a fair

17   and just hearing would be thwarted by his absence and to that extent only").  Due process

18   does not require a defendant's presence where "presence would be useless, or the benefit but

19   a shadow." Id. at 106-07.  This court focuses on the due process rather than the

20   Confrontation Clause aspect of the right to be present because no witness was examined at

21   any of the proceedings from which Ricafort was absent.

22   The right to be present at all critical stages, like most constitutional rights, is subject to

23   harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'"

24   Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir.) (en banc), cert. denied, 546 U.S. 1036

25   (2005) (quoting Rushen v. Spain , 464 U.S. at 117 n.2).  The vast majority of cases will be

26   subject to a harmless error analysis.  See, e.g., United States v. Gagnon, 470 U.S. 522, 527

27   (1985) (harmless error where defendant and his counsel not present for in-camera meeting of

28   judge, juror and lawyer for one defendant where juror expressed concern that defendant was

7

sketching portraits of jury); <u>Rushen v. Spain</u>, 464 U.S. at 117-18 & n.2 (if constitutional error, then error is harmless as to ex parte communication between juror and judge regarding information forgotten during voir dire); <u>Turner v. Marshall</u>, 121 F.3d 1248, 1255 (9th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1153 (1998) (defendant's absence from jury room during readback harmless error).  To obtain habeas relief, the trial error must have "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

> 1.    <u>Pretrial Conference (October 7, 2002)</u>

On October 7, 2002, the court held a pretrial discussion in chambers with counsel regarding scheduling matters and preliminary rulings on motions <u>in limine</u>.  Ricafort was absent.  Ricafort argues that he could have assisted counsel in arguing the <u>in limine</u> motions if he had been present.

The California Court of Appeal rejected Ricafort's claim of constitutional error based on his absence from the this conference. "There was little, if any, argument on these motions, no evidence was introduced, and several of the motions were summarily denied without prejudice to renewal at trial.  He was present at trial for the renewal of any of the motions. Defendant does not suggest how his presence would have contributed to his ability to defend against the charges.  Furthermore, defendant was present throughout the actual trial and never objected to his counsel's waiver of his presence at the hearings."  Cal. Ct. App. Opinion, p. 10.

The California court's rejection of this claim was not an unreasonable application of or contrary to clearly established Supreme Court authority.  Ricafort relies on <u>United States v. Canady</u>, 126 F.3d 352, 360 (2d Cir. 1997), <u>cert. denied</u>, 522 U.S. 1134 (1998), for the proposition that "[a] leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."  The expansive reach of that statement was trimmed by the same court's observation that, "[o]f course, we recognize that the defendant's right to be present is not absolute, and that, where the defendant's presence would be 'useless,' no constitutional right is implicated."  <u>Id.</u> at 361

(quoting Snyder, 291 U.S. at 106-07).  Here, Ricafort has not shown that his presence would have contributed to the fairness of the pretrial conference.

As to the scheduling matters, Ricafort has not even attempted to show how his presence would have made any difference.  Especially because he was in custody, it is difficult to imagine how he could have scheduling conflicts that would require accommodation in the court's scheduling of trial.  Nor was there anything about scheduling that would suggest unfairness to the defendant.

As to the in limine motions, Ricafort claims his absence meant that he lost "any chance of assisting his counsel in arguing the motions." Petition, p. 16.  He does not, however, provide any details of the assistance he might have provided.  As the transcript of the proceeding shows, the in limine motions did not involve argument about the facts and most of the judge's rulings were tentative in nature, as the judge repeatedly mentioned that the matters could be revisited at trial.  See RT 6-17.   This situation was similar to that in Kentucky v. Stincer, 482 U.S. at 745-46, where the Court found no violation of the right to be present where the court conducted an in-chambers hearing after the jury was sworn to question two child-witnesses who were scheduled to testify at trial to determine their competence to testify, although nothing pertaining to their substantive testimony was asked and the defense remained free to cover the same questions in front of the jury.   The Court observed that the defendant had given no indication that his presence would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify; he had presented no evidence that he had some special knowledge of the facts or witnesses so that he could have assisted the court or counsel in questioning them to reach a more assured determination of competency.  Id. at 747. Likewise, it is not enough for Ricafort to say only that he could have helped; he needed to explain how he could have helped so that the effect of his absence can be assessed.  He protests that this is a burden no defendant can shoulder, but he is in the same situation as any defendant who claims he was denied his right to be present, yet the Supreme Court has determined that such a defendant must show that his presence would contribute to the fairness of the procedure.  Ricafort's

United States District Court
For the Northern District of California

1    inability to show any genuine consequence of his absence or any circumstances that suggest

2    his presence would have contributed to the fairness of the procedure is fatal to his claim.

3        2.    Screening of Prospective Jurors (October 8, 2002)

4        On October 7 (at the chambers conference mentioned in the preceding section), the

5    judge explained that he was going to have a group of prospective jurors brought in the next

6    day "at which time I will be doing strictly hardship, basically jury commissioner duties,

7    strictly hardship and language.  They won't know what the issues are, they won't know what

8    the charges are.  I'm not even going to tell them it's a criminal case. [¶] The only issue is can

9    you serve through the end of the month and can you speak English."  RT 6-7.  The judge said

10   that "the attorneys and the defendant are welcome to observe that if you'd like. [¶] The

11   attorneys won't be introduced.  Neither will the defendant.  The jury won't even know that it's

12   a criminal case."  RT 8-9; see RT 16.  Ricafort's attorney said he would talk to Ricafort about

13   whether he wanted to be present but recalled that at the first trial Ricafort "was indifferent,"

14   and later waived his client's appearance at the screening.  RT 16.  The judge responded: "All

15   right.  It doesn't advance anyone anywhere.  The jurors sit there looking at him and he

16   basically learns nothing about them" except that many prospective jurors have travel plans

17   and/or poor English skills.  Id.

18       On October 8, 2002, the trial judge addressed the prospective jurors who had been

19   brought to the courtroom.  He did not wear his robe, did not sit on the bench, and tried to

20   keep the initial encounter with the prospective jurors informal.  See RT 18.  The judge

21   thanked them for their service and made the usual comments to make jurors to feel more

22   comfortable and valued.  RT 18-20.  The judge explained the trial would run through the end

23   of the month and his intended trial schedule.  He then divided up the jurors into two groups.

24   The first group included those for whom it would be "impossible to serve on this case with

25   the schedule that I've outlined though the 30th or the 31st of this month" and those who had

26   language problems such that they did not understand English very well.  RT 23-24.  (The

27   second group included everyone not in the first group (and is not a concern here); they were

28   sent away and told to report back the next day.  RT 24.)  The judge then screened the

prospective jurors claiming hardships and language problems in an unreported proceeding. RT 25.  The introductory remarks that were reported contain no mention of anything about the case, other than the expected length of trial.

The California Court of Appeal rejected Ricafort's claim that he was denied his constitutional right to be present at the proceeding.  Even assuming Ricafort was absent, "he has provided no support for a possible basis for an objection to dismissal of a potential juror for hardship or inability to understand English, and he offers no scenario in which an objection would be appropriate.  No prejudice has been shown."  Cal. Ct. App. Opinion, p. 10.

Ricafort contends that his absence from the screening prevented him from objecting to any of the court's decisions to excuse jurors and that the jurors who eventually were selected "could very well have wondered why the petitioner was not there."  Petition, p. 16.  This does not show that his presence would have contributed to the fairness of the procedure.  The trial judge did not contemplate any role for either the prosecution or defense at the hardship screening, and if the defendant or an attorney had been present, he would have been merely a silent observer.  As to his ability to object to the judge excusing any particular juror, Ricafort does not show that there were improperly excused prospective jurors – a showing he cannot make because the screening was not reported.  Generally, a party does not want to be the one objecting to a juror who wants to be excused from jury duty for hardship, out of concern that the prospective juror may hold that against the party who has insisted that the prospective juror remain seated despite his/her prepaid vacation plans, work plans, family needs or perceived inability to understand the proceedings.  The trial judge's reported introductory statements show that the screening process was wholly detached from any mention of Ricafort's case.  There is no reason to presume that, once the reported part of the proceeding ended, the judge started talking about the particulars of Ricafort's case especially since he had explained the preceding day that he did not intend to mention anything about the case.

The manner in which the judge did the screening was such that jurors would not have been wondering why the defendant was not present.  The judge was not wearing his robe and

1   addressed the jurors from the front of the gallery instead of from the bench.  No one was

2   introduced and nothing about the case was mentioned.  Under the circumstances, it was most

3   unlikely that any prospective juror attached any meaning to the absence of the prosecutor,

4   defense counsel or defendant.  This is especially so because these participants were all

5   present for the actual voir dire that started the day after the hardship screening was done.

6        3.    <u>Mid-trial Hearing (October 29, 2002)</u>

7        Ricafort was absent from a hearing on October 29, 2002 that occurred outside the

8   presence of the jurors.  During this mid-trial proceeding, the information was amended and

9   his counsel waived his arraignment on the amended information.  The judge and lawyers also

10  conferred about the jury instructions.  And defense counsel argued his motion to dismiss the

11  charges against Ricafort.

12       The California Court of Appeal noted that Ricafort did nothing more than speculate

13  that he could have contributed to this proceeding at which counsel had expressly waived his

14  appearance.  Cal. Ct. App. Opinion, p. 11.

15       The amendment to the information was merely to specify arson in place of "larceny
      and any felony" as the predicate crime for the burglary charge.  Arson was always the
16    intended felony, as can be seen from both counsel's opening statements referring to
      the fire.  Defendant has made no showing of how his absence at the time of this minor
17    adjustment to the information prejudiced him.  Neither has he specified how his
      absence during the discussion of jury instructions impacted his ability to defend
18    against the charges.  He does not challenge any of the instructions or suggest that
      others should have been given.

19
         Defense counsel's argument about admitting evidence of the prior acquittal of
20    making criminal threats involved only legal issues, which we discuss later in this
      opinion.  Both counsel agreed on the evidence that formed the basis for the prior
21    charge.  The trial court ruled on counsel's legal argument.  Defendant has not shown
      how his absence during that argument impacted his right to defend against the charges
22    or what contribution he might have made to the resolution of this purely legal issue.

23       Finally, defendant's absence from the argument on counsel's section 1118.1
      motion did not prejudice his case.  Determination of such a motion is governed by a
24    substantial evidence standard [Citation.] The evidence supporting the charges was
      extensive and substantial.  Defendant has not suggested how his personal presence
25    would have promoted the fairness of his trial or changed the result in any manner.

26  Cal. Ct. App. Opinion, p. 11.

27       Ricafort argues that "certainly [he] could have contributed to an argument that

28  summed up the evidence against him in this highly personal trial involving the interplay

**United States District Court**
For the Northern District of California

between him, Stokley, and Grace." Petition, p. 17. As with his other arguments, the absence of any detail of how he could have contributed shows the lack of merit to his contention. He has the transcript and knows what was said at the hearing, yet he is unable to suggest how he could have assisted counsel or pointed to any shortcomings in counsel's arguments. He has not shown how his presence would have contributed to the fairness of the procedure. <u>See Kentucky v. Stincer</u>, 482 U.S. at 745; <u>cf.</u> <u>United States v. Rubin</u>, 37 F.3d 49, 54 (2d Cir. 1994) (no constitutional right to be present during at conference on instructions); <u>United States v. Jorgenson</u>, 451 F.2d 516, 521 (10th Cir. 1971), <u>cert. denied</u>, 405 U.S. 922 (1972) (no right to presence at conference on admission of evidence); <u>cf.</u> <u>United States v. Sherman</u>, 821 F.2d 1337, 1339 (9th Cir. 1987) (no right to presence at instructional conference under Federal Rule of Criminal Procedure 43). Petitioner's absence from the conference did not violate his constitutional rights, and he is not entitled to habeas relief on this basis.

Ricafort's absence when the information was amended is more difficult, as a defendant usually would be present at his arraignment but Ricafort's counsel waived his arraignment on the amended information. The amendment of the information here was only a technical change that did not alter or expand his criminal liability exposure. The information was merely amended to specify that the predicate felony for the burglary was arson in place of the more generic allegation in the original information that the burglary was done to commit larceny or a felony. Not only was it just a clarifying amendment, Ricafort does not dispute the state appellate court's determination that the amendment was not at all unexpected as the parties knew from the outset that arson was the predicate felony for the burglary. Ricafort's absence did not detract from the fairness of the procedure.

Before he filed his petition for review in the California Supreme Court and his habeas petitions in that court and in this court, Ricafort had the benefit of the California Court of Appeal's analysis that rejected his right-to-presence claims for a lack of any showing that his absence made any difference at the various proceedings. Even with the benefit of the transcripts and a court opinion pointing out the specific deficiency in his argument, Ricafort has never been able to muster anything more specific than his generalized contention that he

could have helped counsel if he was present.  His generalized statements that he could have contributed to counsel's arguments are not sufficient to show that his presence would have been useful in ensuring a more reliable determination.  Also, he has not pointed out anything about the circumstances of the hearings to suggest Ricafort's presence would have ensured a fairer procedure.  The crimes with which he was charged were not complicated and the law was not difficult for a criminal defense attorney to master.  The transcripts show that the arguments were mostly legal matters, and Ricafort does not show how he could have made that argument any fairer.

    4.    <u>Sentence Correction (November 11, 2003)</u>

When Ricafort was sentenced to five years in prison in December 2002, the court stated that he had 498 days of custody credit, including 332 days of actual custody and 166 days of good conduct credit.  The 166 days of good conduct credit was erroneous, however, and the Department of Corrections notified the court of that error on October 27, 2003.  Specifically, because Ricafort had been convicted of a specified violent felony (i.e., arson, <u>see</u> Cal. Penal Code § 667.5(c)(10)), he was ineligible to accrue more than 15 percent of the applicable credit against his presentence custody time under California Penal Code § 2933.1.  Resp. Exh. I, Cal. Ct. App. Opinion in Case No. A107619, p. 2.  "On November 11, 2003, the district attorney and the public defender appeared in court and the court modified the sentence to reflect 49 days of conduct credit for a total of 381 days of credit.  The abstract of judgment was amended accordingly."  <u>Id.</u>

The California Court of Appeal rejected Ricafort's claim that he had been denied his right to be present at the proceeding.  The court explained that, under state law, Ricafort's presence was required if it bore a reasonable and substantial relationship to his full opportunity to defend against the charge.  <u>Id.</u>  The court implicitly found that his presence did not bear such a relationship.  Ricafort "was not entitled to the credit as originally calculated.  No factual issue existed and the matter involved only a question of law.  No rights were violated when the court amended the calculation of presentence custody credit."  <u>Id.</u> at 3.

14

United States District Court
For the Northern District of California

1    This court similarly sees no way in which Ricafort's presence would have affected the

2    sentence correction hearing that was almost clerical in nature.  The proceeding in question

3    was not the original sentencing.  Ricafort had attended and spoke at his original sentencing

4    on December 23, 2002.  Resp. Exh. F, CT 324, 336-42.  Cf. United States v. Napier, 463

5    F.3d 1040, 1042 (9th Cir. 2006) (finding constitutional error in the inclusion in the written

6    judgment nonstandard conditions of supervised release which were not included in the court's

7    oral pronouncement of defendant's sentence).  Ricafort argues that if he had been present at

8    the sentence correction hearing, he could have "present[ed] mitigating information and

9    inform[ed] the court of his behavior in prison" and could have asked for a lesser prison term.

10   Traverse, p. 6.  That information was wholly irrelevant to the credit issue.  Ricafort has not

11   shown that the court had the inclination or authority to vacate the lawful 5-year sentence

12   already imposed and impose a different sentence.  Any opportunity to change the sentence

13   apparently expired 120 days after the sentence was imposed, see Cal. Penal Code § 1170(d),

14   and Ricafort had already made an unsuccessful motion under that section in May 2003.  See

15   Resp. Exh. G, CT 6-29.  The hearing in November 2003 was for the specific purpose of

16   correcting a time credit calculation and nothing Ricafort wanted to present was relevant to

17   that issue.  Further, as reflected by the transcript that was barely more than one page long, the

18   "hearing" was extraordinarily brief and basically consisted of the court informing counsel of

19   the change he had to make and the two attorneys saying, "submitted."  See Resp. Exh. H, RT

20   10-11.  There is not an ounce of doubt that Ricafort's absence from this hearing had no effect

21   at all on the fairness of the procedure.

22   Ricafort has not shown that the state court of appeal's rejection of his claims that his

23   constitutional right to be present was violated at any of the four proceedings was contrary to

24   or an unreasonable application of clearly established federal law as set forth by the U.S.

25   Supreme Court.

26   B.    Assistance Of Counsel

27   Ricafort next asserts that his trial counsel was ineffective for waiving his right to be

28   present at the four proceedings discussed in the preceding section.  He also asserts that

appellate counsel was ineffective for not raising trial counsel's ineffectiveness in the appeal.

### 1.   Trial Counsel

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel.  See Strickland v. Washington, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  See id.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94.

Ricafort's ineffective assistance of counsel claim is based on trial counsel's failure to require his presence at the proceedings discussed in the preceding section and falters with his main claim that he was denied his right to be present.  As discussed in the preceding section, Ricafort failed to demonstrate any prejudice resulting from his absence from the four proceedings.  Similarly, he has failed to demonstrate the prejudice required under Strickland. That is, he has not shown that, but for counsel's failure to let him personally choose whether to attend each of the four proceedings, the result of the proceeding would have been different even if he had chosen to attend some or all of those proceedings.

### 2.   Appellate Counsel

The Due Process Clause guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  See generally Evitts v. Lucey, 469 U.S. 387 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland, 466 U.S. 668.  See Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  Ricafort therefore must show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's

unprofessional errors, he would have prevailed on appeal.  See id. at 1434 & n.9 (citing

Strickland, 466 U.S. at 688, 694).  The Constitution does not require appellate counsel to

raise every colorable or non-frivolous claim; to the contrary, effective appellate advocacy

involves weeding out weaker claims in order to focus on stronger ones.  See id.  Appellate

counsel therefore will frequently remain above an objective standard of competence and have

caused his client no prejudice because he declined to raise a weak issue.  See id.  That is the

case here.

Ricafort claims that appellate counsel was deficient for failing to raise on appeal the

issue of trial counsel's ineffectiveness.  As discussed above, Ricafort's claim concerning his

trial counsel's performance falters with the underlying right-to-presence claim.  Raising the

ineffective assistance of trial counsel claim on direct appeal might not have been patently

frivolous, but would not have led to a reasonable probability that he would have prevailed on

appeal.  It was not ineffective assistance for appellate counsel to avoid raising the very weak

claim of ineffective assistance of trial counsel.

C.    Right To Present A Defense

At trial, evidence was presented about Ricafort's jealousy and hatred of Patigdas.  This

included evidence that on one occasion he kicked the door of the bathroom when Patigdas

was in it and then told Stokley he would kill Patigdas if she did not move out of the

residence.  Ricafort wanted to counter this evidence with evidence that he had been acquitted

of making a criminal threat against Patigdas.  Ricafort contends that his right to present a

defense was violated when the court excluded evidence of his acquittal of making a criminal

threat against Patigdas after allowing evidence that he had made the threat.

The trial court denied the motion to admit that evidence, essentially finding it

irrelevant.  No evidence had been presented that the threat was a crime, or that Ricafort had

been arrested or charged with a crime based on the threat.  See RT 909 (defense counsel

conceding the threat "was never presented as a crime").  After hearing the prosecutor and

defense counsel give brief descriptions of the criminal charge that led to the acquittal, the

court agreed with the prosecutor that the acquittal had been due to the fact that the threat had

no impact on the target because she did not hear of it until a few days later when Stokley told her what Ricafort had said.  See RT 910-12.  The trial court excluded the evidence because the threat had not been introduced as a separate crime but instead had been introduced as evidence of "a developing relationship that's integral to establish motive in this arson case." RT 912.  The issues in the present trial were Ricafort's motive and whether he was the person who set the fire – not the impact of his threatening statements on Patigdas, so the acquittal that was based on the lack of impact on the target was not relevant.  RT 913.

The California Court of Appeal rejected Ricafort's challenge to this ruling, concluding that acquittal was properly excluded under state law and was irrelevant.  See Cal. Ct. App. Opinion, pp. 13-14.  The court explained that the "purpose of the evidence of [Ricafort's] animosity towards Patigdas was to show a motive for setting the fire, which the fire inspector described as a spite fire." Id. at 14.  If evidence was admitted that Ricafort was acquitted of a criminal threat in violation of California Penal Code § 422, it "would have necessitated a description of the elements of that crime and the basis for the prior charge and would have injected unnecessary and irrelevant issues into the trial." Cal. Ct. App. Opinion, p. 14.  Even if there was an error, it was harmless because there was overwhelming evidence that Ricafort had a grudge against and wanted to kill Patigdas.  Id.  This threat was only one of several verbal threats Ricafort had made regarding Patigdas, he had admitted to police when arrested that he had wanted to kill Patigdas, and his "writings and statements all evidenced jealousy and hatred of Patigdas's position with Stokley." id.

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  Washington v. Texas, 388 U.S. 14, 19 (1967).  This right was held applicable to the states through the

18

Fourteenth Amendment.  See id. at 18-19.  A cluster of Supreme Court cases have addressed the criminal defendant's right to present evidence in support of his defense.  In Chambers v. Mississippi, 410 U.S. 284 (1973), the Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime.  And in Crane v. Kentucky, 476 U.S. at 690-91, the Court held that the defendant's right to present a defense was violated by a trial court's blanket exclusion of competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.  See also Green v. Georgia, 442 U.S. 95 (1979) (finding a due process violation in the exclusion of highly relevant and reliable hearsay evidence on a key issue); Rock v. Arkansas, 483 U.S. 44, 56-62 (1987) (Arkansas' per se rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict defendant's right to testify).

The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  Chambers, 410 U.S. at 295; Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  Thus, the accused's compulsory process right may be limited by evidentiary rules.  See Perry v. Rushen, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of compulsory process to prohibit evidence of third party identity because evidence collateral and state interest in evidentiary rule overriding), cert. denied, 469 U.S. 838 (1984);  cf. Montana v. Egelhoff, 518 U.S. 37, 42-43 (1996) (defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence; the exclusion of evidence does not violate the Due Process Clause unless it offends some fundamental principle of justice).  "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of  'harassment, prejudice, [or] confusion of the issues. . . .  Moreover, [the Court has] never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of

1   fairness and reliability--even if the defendant would prefer to see that evidence admitted."

2   Crane, 476 U.S. at 689-90 (citations omitted).

3        The exclusion of the evidence as irrelevant is in accord with Eglehoff, 518 U.S. at 42-

4   43, which permits the exclusion of evidence that is inadmissible under standard rules of

5   evidence.   The evidence of the acquittal was irrelevant to the question of whether Ricafort

6   was the arsonist and the related issue of whether he had a motive to commit arson at that

7   house.  The evidence that he had made the threat was not presented as having been a criminal

8   act, such that the acquittal evidence was necessary to give a balanced picture.  The acquittal

9   did not reflect that the statement had not been made but only that it had not had the necessary

10  impact on the victim.

11       Even if the evidence had any relevance, it was properly excluded under California

12  Evidence Code § 352, a rather commonplace kind of evidentiary rule that allows the

13  exclusion of evidence where its probative value is substantially outweighed by some other

14  factor such as undue consumption of time, undue prejudice, issue confusion or misleading

15  the jury.  Cf. Fed. R. Evid. 403.  In determining whether the right to present a defense has

16  been violated the court considers several factors, e.g., the probative value of the excluded

17  evidence on the central issue; the evidence's reliability; whether the evidence is capable of

18  evaluation by the trier of fact; whether it is the sole evidence on the issue or merely

19  cumulative; and whether the excluded evidence constitutes a major part of the attempted

20  defense.  See Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004), cert. denied, 544 U.S. 919

21  (2005); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000), cert. denied, 532 U.S. 984

22  (2001).  The probative value of the acquittal was nil insofar as it pertained to the questions of

23  whether Ricafort had a motive and was the person who started the fire.  The evidence was

24  reliable, but only on the collateral point that a § 422 offense had not been established in an

25  earlier trial.  Most importantly, the evidence of the acquittal was not capable of ready

26  evaluation by the jury.  Other evidence and an explanation of the elements of a § 422 offense

27  would have been necessary to put the acquittal in perspective.  Unlike more familiar crimes

28  such as murder and robbery, the § 422 criminal threat is an offense not known to most lay

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

people and it had the unusual element that the defendant's acts have a particular impact on the target.  The jury learning that Ricafort had not put Patigdas in immediate fear with his statement would not have helped him avoid conviction on the arson and burglary charges. The acquittal was the sole evidence on the point, but it was a collateral point and not a major part of the attempted defense.  Evidence of the acquittal would have done little to change the jury's mind about the animosity Ricafort held and expressed toward Patigdas.  The trial court was rightly concerned about the trial getting side-tracked on the irrelevant issue Ricafort was trying to inject with the acquittal.  The exclusion of the evidence did not violate his right to present a defense.   After consideration of the factors identified in <u>Chia</u>, the court is convinced that the exclusion of evidence about Ricafort's acquittal did not violate his federal constitutional right to present a defense.  Finally, as the state appellate court explained, there was an abundance of other evidence of Ricafort's hatred of Patigdas and desire to get her out of the house and out of Stokley's life.  <u>See, e.g.</u>, RT 91-106, 114, 126-27, 343-50, 693-94. Even if there was error in excluding the acquittal, it did not have a substantial and injurious effect or influence in determining the jury's verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637. The state appellate court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law on the constitutional right to present a defense.

**CONCLUSION**

The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED:   April 10, 2008

Marilyn Hall Patel
United States District Judge